**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE of NEW JERSEY, *ex rel.* PHILIP VARUGHESE and SWATINI, LLC,<br><br>    Plaintiff(s),<br><br>v.<br><br>DAVITA, INC.,<br><br>    Defendant(s). | 18 Civ. _____<br><br>**COMPLAINT**<br><br>**Filed Under Seal**<br><br>Jury Trial Demanded |

Plaintiffs, the United States and the State of New Jersey, and Relators Philip Varughese and Swatini, LLC, ("Relators") by and through their undersigned counsel, hereby allege for their Complaint against DaVita, Inc. ("Defendant"), as follows:

## NATURE OF THE ACTION

1.     This is an action filed by Relators on behalf of the United States and the State of New Jersey, under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as amended ("FCA"), and the state law counterpart, to recover money damages and civil penalties arising from false statements and false claims knowingly submitted or knowingly caused to be submitted to the federal government by Defendant.

2.     This qui tam is brought against DaVita, Inc., a leading provider of dialysis services in the United States for patients suffering from end stage renal disease. DaVita both wholly-owns dialysis centers and owns a controlling interest in joint ventures that operate other centers. By forming joint ventures with physicians, DaVita provides its physicians with an ongoing stream of kickbacks in the form of distribution of profits from the centers.

3.     Regulations issued by the U.S. Department of Health and Human Services ("HHS")

define certain "safe harbors" to describe types of financial relationships that would otherwise be prohibited by the Anti-Kickback Statute, including a safe harbor covering certain situations in which a physician is an investor in a dialysis center to which that physician makes referrals or otherwise recommends to patients. This "safe harbor" is narrowly tailored to prevent improper economic inducements from being disguised as legitimate investment mechanisms. As HHS OIG has explained: "With respect to joint ventures, the major concern is that the profit distributions to investors in the joint venture, who are also referral sources to the joint venture, may potentially represent remuneration for those referrals." HHS OIG Advisory Opinion 97-5, at 7 (October 6, 1997)). However, as DaVita itself recognizes, its joint ventures with physicians do not satisfy this safe harbor.

4.      Moreover, since at least 2015, DaVita has intentionally reallocated expenses from its joint venture dialysis centers to its wholly corporate-owned dialysis centers to improve the profitability of the joint ventures. By shifting costs from the facilities that were joint ventures between DaVita and physicians to the facilities that were wholly-owned by DaVita, DaVita paid a greater share of the costs, and increased the profits payable to the physicians.

5.      This manipulation of costs and payment of increased profits constitutes payments to the physicians in exchange for referrals, in clear violation of the Anti-Kickback Statute and the False Claims Act.

## PARTIES

6.      Plaintiff United States of America, acting through HHS and the Centers for Medicare and Medicaid Services ("CMS"), is responsible for administering the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 et seq. ("Medicare"), and Grants to States for Medical Assistance Programs

2

pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

7.    Plaintiff State of New Jersey, acting through the Department of Human Services (DHS), is responsible for administering the New Jersey State Medicaid program.

8.    Relator, Philip Varughese ("Varughese"), is a citizen of the State of New Jersey and Relator Swatini, LLC, is a limited liability company licensed by the State of New Jersey, and wholly-owned by Varughese. Varughese was employed by DaVita from 1999 to 2018. He worked as a Facility Manager in New York from 1999 to 2015, when he became the Facility Manager for the DaVita facility in Hillsborough, New Jersey. Relators bring this action on behalf of the United States of America pursuant to the private action provisions of the False Claims Act, 31 U.S.C. § 3730(b).

9.    Defendant DaVita, Inc. is a Delaware corporation with its corporate headquarters located at 2000 16th Street, Denver, Colorado 80202. According to its most recent annual report, DaVita is a leading provider of dialysis services in the United States for patients suffering from chronic kidney failure, also known as end stage renal disease, or ESRD. As of December 31, 2017, DaVita operated 2,510 outpatient dialysis centers located in 46 states and the District of Columbia, serving approximately 197,800 patients. Its dialysis and related lab services business accounts for approximately 86% of its consolidated revenues. (2017 10-K at 5). As of December 31, 2017, approximately 74.9% of DaVita's dialysis patients were covered under Medicare and Medicare-assigned plans. (*Id.* at 2-3).

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1331.

11.    Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b) and

3

31 U.S.C. § 3732(a) in that the Defendant can be found, resides and/or transacts business in this District and in that a substantial number of the false claims at issue were submitted or caused to be submitted in this District.

12.     Relators have direct and independent knowledge of the information upon which the allegations are based and have voluntarily provided notice of this action to the U.S. Attorney's Office for the District of New Jersey before filing this *qui tam* action.

## STATUTORY FRAMEWORK

**A.     The False Claims Act**

13.     The FCA provides, in pertinent part, that:

> (a) (1) . . . [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), . . . or (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . is liable to the United States Government . . . .

> \*    \*    \*

> (b) (1) [T]he terms "knowing" and "knowingly" --

> (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (ii) acts in reckless disregard of the truth or falsity of the information, and

> (B) require no proof of specific intent to defraud

31 U.S.C. § 3729.

14.     Any person who violates the False Claims Act is liable to the United States for up to three times the amount of damages sustained by the federal government and civil penalties of

between $5,500 and $11,000, as amended by the Federal Civil Penalties Inflation Act, for each violation.

15.     New Jersey has enacted a false claims act containing provisions identical or similar to the federal False Claims Act described above. *See* N.J. Stat. Ann. §§ 2A:32C-1, *et seq*.

**B.     The Medicare Program**

16.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with ESRD. *See* 42 U.S.C. §§ 426, 426A.

12.     HHS is responsible for the administration and supervision of the Medicare Program.  CMS, formerly known as the Health Care Financing Administration, is an agency of HHS and directly responsible for the administration of the Medicare program.

13.     The Medicare Program has several parts, one of which, commonly referred to as "Medicare Part A," authorizes payments for institutional care, including, hospital, skilled nursing facility, and home health care.  42 U.S.C. §§ 1395c-1395i-4.

14.     Medicare Part B covers physician services as well as a variety of "medical and health services," both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider.

15.     Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

16.     Since 1972, the federal government has provided healthcare coverage for ESRD patients under the Medicare ESRD program regardless of age or financial circumstances.  Medicare provides benefits for ESRD patients under parts A and B.  For patients with Medicare

coverage, all ESRD payments for dialysis treatments are made under a single bundled payment rate.

17.    In addition to other limitations on coverage, Medicare covers only those services that are "reasonable and necessary." 42 U.S.C. § 1395(a)(1)(A).

18.    To participate in the Medicare program, a medical provider must file a provider agreement with the Secretary of HHS ("Secretary"). 42 U.S.C. § 1395(cc).  The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program.  *Id.*

19.    Form CMS-855A is the Enrollment Application for providers.  All providers, including physicians employed by DaVita, are required to execute this form to participate in Medicare and receive reimbursement.  As part of completing the CMS-855A, a certification must be executed, which reads in pertinent part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the providers compliance with all applicable conditions of participation in Medicare.

The rules governing the Medicare Program are set forth in the statute (the "Medicare Act"), regulations, and the manuals, rulings and other policy statements issued by CMS, including, but not limited to the Provider Reimbursement Manual and the CMS Online Manual System.

## C.    The Medicaid Program

20.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid

is largely limited to providing matching federal funds and ensuring that states comply with minimum standards in the administration of the program.

21.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP).  42 U.S.C. §§ 1396 *et seq.*

22.     To participate in the Medicaid program, a state must develop a plan that is approved by the Secretary as meeting federal requirements.  The state pays qualified providers for furnishing necessary services covered by the state plan to individuals who are eligible for medical assistance.  The federal government contributes a proportion of the costs that each participating state incurs in purchasing items and services from qualified providers on behalf of eligible persons.  The state bears the remainder of the costs.  In New Jersey, funding for the Medicaid program is approximately 50% federal funds and 50% state.

23.     In New Jersey, providers participating in the Medicaid program submit claims for services rendered to Medicaid beneficiaries to the New Jersey Department of Human Services for payment.

24.     Individuals may be "dual eligible" for both the Medicare program (as the primary insurer) and the Medicaid program (as the secondary insurer).

**D.      The Federal Anti-Kickback Statute**

25.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To protect the integrity of the program from these harms, which are difficult to detect, Congress enacted a per se prohibition against the payment of kickbacks in

7

any form, regardless of whether the particular kickback gave rise to overutilization or poor quality or care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

26.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare or Medicaid programs.  In pertinent part, the statute states:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

8

27.    The Anti-Kickback Statute defines impermissible "payments" broadly as: "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)(1). In addition to the more obvious types of remuneration (e.g., cash payments), the statute also prohibits less direct forms of payment such as providing items or services at less than market value, or investment arrangements where the referring provider has a substantial financial interest in referring his or her patients to the joint venture.

28.    The Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") is responsible for issuing regulations and guidance interpreting the Anti-Kickback Statute. In this capacity, HHS OIG has expressed particular concern that the type of transaction at issue in this case, a joint venture where a referring physician owns part of the entity to which he or she refers patients, has a strong likelihood of violating the Anti-Kickback Statute and thus should be subject to heightened scrutiny.

29.    The HHS OIG has issued regulations defining certain "safe harbors" to describe types of financial relationships that would otherwise be prohibited by the Anti-Kickback Statute, but do not present sufficient concern that they should ordinarily be subject to the law. The burden is on the party seeking to benefit from the safe harbor to demonstrate that the transaction falls within its protection.

30.    One such safe harbor covers certain situations in which a physician is an investor in a dialysis center or other business to which that physician makes referrals or otherwise recommends to patients. *See* 42 C.F.R. § 1001.952. Ordinarily, any money a physician received as a result of his or her investment in the dialysis center – such as a regular distribution of profits – could constitute illegal remuneration under the Anti-Kickback Statute.

31.    This "safe harbor" is narrowly tailored to prevent improper economic inducements from being disguised as legitimate investment mechanisms. As HHS OG explained: "With respect to joint ventures, the major concern is that the profit distributions to investors in the joint venture, who are also referral sources to the joint venture, may potentially represent remuneration for those referrals." HHS OIG Advisory Opinion 97-5, at 7 (October 6, 1997)).

32.    An entity whose activity would otherwise be covered by the broad, remedial language of the Anti-Kickback Statute is exempted from liability through the "safe harbor" only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations. 42 C.F.R. § 1001.952(a). Four of those requirements are particularly relevant here:

(a)  "No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12-month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity;" and

(b)  "The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity;" and

(c)  "No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12-

10

month period may come from referrals or business otherwise generated from investors;" and

        (d)  "The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor."

*See* 42 C.F.R. § 1001.952(a)(2)(i), (iii), (vi), (viii)).

33.      As will be discussed below, DaVita's transactions with physicians do not fall within this safe harbor.

34.      Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider in federal and state-funded health care programs.  With regard to Medicare and Medicaid, for example, each provider that participates in the programs must sign a provider agreement with his or her state.  Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicare and Medicaid providers to agree that they will comply with all legal requirements, which include the anti-kickback provisions of the law.  In a number of states, the Medicare and Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicare or Medicaid program, including compliance with federal laws.

35.      In sum, either pursuant to provider agreements, claims forms, or in another manner, providers who participate in a federal or state-funded health care program must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

36.      Any party convicted under the AKS must be excluded from federal health care programs (i.e., not allowed to bill for services rendered) for a term of at least five years. 42

U.S.C. §1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must also direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. §1320a-7(b).

37.     Thus, compliance with the Anti-Kickback Statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs. Similarly, compliance with the Anti-Kickback Statute and comparable state anti-kickback statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from state-funded health care programs. Claims for reimbursement for services tainted by kickbacks prohibited by the Anti-Kickback Statute are false or fraudulent under the False Claims Act because providers of such services are ineligible to participate in government health care programs, and the government would not have paid such claims had it known of the kickbacks. *See* 31 U.S.C. §§ 3729(a) & (b); 42. U.S.C. §§ 1320a-7b(b), (f) &(g).

## THE FRAUDULENT SCHEME

38.     As noted above, as of December 31, 2017, DaVita operated 2,510 outpatient dialysis centers located in 46 states and the District of Columbia, serving approximately 197,800 patients, including 70 centers located in New Jersey. Its dialysis and related lab services business accounts for approximately 86% of its consolidated revenues, and, as of December 31, 2017, approximately 74.9% of its dialysis patients were covered under Medicare and Medicare-assigned plans. (*Id.* at 2-3).

39.     The dialysis centers operated by DaVita may be wholly-owned by DaVita or they may be owned by joint ventures in which DaVita owns a controlling interest.

40.     DaVita's business model is fundamentally dependent on its relationship with physicians who refer patients to its dialysis centers – especially its relationships with the few key physicians who are responsible for a major share of all patients who are treated at the centers. As DaVita has explained in its 2017 annual report filed with the Securities and Exchange Commission:

> As is typical in the dialysis industry, one or a few physicians, including the outpatient dialysis center's medical director, usually account for all or a significant portion of an outpatient dialysis center's patient base. . . .  If a significant number of physicians, including an outpatient dialysis center's medical directors, were to cease referring patients to our outpatient dialysis centers, it would have a material adverse effect on our business, results of operations and financial condition.

2017 10-K at 9.

41.     Rather than working to generate business by simply demonstrating superior quality of clinical services and patient care, DaVita intentionally uses illegal kickbacks to physicians to secure a steady flow of referrals.

42.     In 2014, DaVita agreed to pay $350 million to the United States to resolve claims that it had violated the False Claims Act by paying kickbacks to induce the referrals of patients to its dialysis clinics in the form of the purchase and sale of joint ventures.  In that case, captioned *United States ex rel. Barbetta v. DaVita, Inc. and Total Renal Care*, No. 09-cv-02175 (D. Colo.), the Government found that DaVita used improper financial and contractual arrangements to induce nephrologists to refer patients to DaVita's dialysis centers, namely, joint venture arrangements offered to specific physicians or physician groups that were created through partial divestiture of existing DaVita dialysis operations to the physicians at

13

unreasonably favorable prices, and/or joint venture arrangements offered to specific physicians or physicians groups that were created through partial acquisitions of dialysis operations owned by physicians at prices that exceed fair market value.  In other words, DaVita was paying kickbacks to physicians by entering joint venture arrangements in which DaVita was buying in at inflated prices, and selling interests at rates well below market value.

43.    Notwithstanding this settlement, and DaVita's recognition that joint ventures with physicians implicate the Anti-Kickback Statute, as of December 31, 2017, approximately 24% of DaVita's net U.S. dialysis and related lab services revenues were derived from joint ventures with physicians or physician groups.  2017 10-K at 11.

44.    By forming joint ventures with physicians, DaVita provides its physicians with an ongoing stream of kickbacks in the form of distribution of profits from the centers.

45.    As set forth above, HHS OIG has recognized that such revenue streams pose a substantial risk of violating the Anti-Kickback Statute, because the physician is in a position to earn profits based on the volume and value of referrals he or she sends to the joint venture.  Accordingly, HHS OIG has created a safe harbor, which allows physician ownership of such joint ventures only if the transaction meets the eight requirements of the safe harbor.  *See* 42 C.F.R. § 1001.952(a)(2).

46.    However, as DaVita itself recognizes, its "relationships with physicians and other referral sources relating to these joint ventures do not fully satisfy the safe harbor for investments in small entities."  2017 10-K at 11.

14

47.     A transaction that fails to comply with one of the safe harbors does not necessarily violate the Anti-Kickback Statute.  Instead, the facts and circumstances surrounding such transactions must be analyzed to determine whether the physicians were paid, in whole or in part, in order to influence where the physicians referred their patients.  As discussed below, DaVita's practices clearly evidence payments in exchange for referrals.

48.     First, in many cases, physicians who refer business to the joint venture own more than 40% of the entity, in violation of 42 C.F.R. § 1001.952(a)(2)(i).  For example, Varughese was advised that 49% of the Hillsborough Dialysis Center in Hillsborough, New Jersey, where Varughese was the Facility Administrator, was owned by the physicians.

49.     Second, DaVita manipulated the expenses charged to its joint ventures so as to fraudulently increase the profits payable to its physician partners.

50.     Specifically, DaVita improperly charged the salaries of the following employees to a dialysis center that was wholly-owned by DaVita even though the employees worked for a dialysis center that was a DaVita-physician joint venture:

a.  Varughese, the Facility Administrator of the Hillsborough Dialysis Center, a joint venture, was directed to charge his salary to Bridgewater Dialysis, a facility that was wholly-owned by DaVita.  Varughese's annual salary was $100,000.00;

b.  Caroline Hann was a social worker who divided her time among Hillsborough and Rahway Dialysis Center, both joint ventures, and the Durham Corners Dialysis facility, a wholly-owned facility, but her salary was charged 100% to the Durham Corners Dialysis facility;

c.  Cicily Dei Medici, was the Clinical Coordinator for Hillsborough but her annual salary of $80-90,000 was charged to Bridgewater;

15

d. Priti Trivedi, was a Dietician who divided her time between Hillsborough and the Somerset facility, a wholly-owned DaVita facility, but her salary was charged entirely to Somerset.

51.    DaVita also charged expenses incurred at joint venture facilities to corporate owned facilities. For example, Varughese was directed not to charge the expense for the open house at the Hillsborough facility to Hillsborough. Upon information and belief, the expenses for the open house, totaling $4,000, were charged as a corporate expense.

52.    Similarly, in January 2017, the annual cost of fire alarm services for Hillsborough facility were charged to the Bridgewater facility.

53.    In November, 2017, when Varughese challenged this allocation of Hillsborough's salaries and expenses, he was told that it would make Hillsborough's end of the year expenses better.

54.    By shifting costs from the joint ventures between DaVita and physicians to the facilities that were wholly-owned by DaVita, DaVita paid a greater share of the costs, and increased the profits of the joint ventures to the benefit of the physicians partners.

55.    This manipulation of costs and payment of increased profits constitutes payments to the physicians in exchange for referrals, in clear violation of the Anti-Kickback Statute and False Claims Act.

## COUNT I

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A), Presenting Claims to Medicare and Medicaid for Designated Health Services Rendered as a Result of Violations of the Stark Statute and Anti-Kickback Laws

56.    Plaintiffs repeat and realleges ¶¶ 1 to 55 as if fully set forth herein.

57.    DaVita knowingly provided kickbacks or other illegal remuneration to induce physicians to refer Medicare and Medicaid patients to DaVita for the provision of medical services.

58.    DaVita knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement for designated health services rendered to patients who were referred by physicians with whom DaVita had entered into prohibited financial relationships in violation of the Anti-Kickback Statute.

59.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

60.    By virtue of the false or fraudulent claims made and caused to be made by defendants, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty pursuant to the FCA, as amended by the Federal Civil Penalties Inflation Act, for each violation.

## COUNT II

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B), Making or Using False Records or Statements to Cause Claims to Be Paid In Connection with Designated Health Services Rendered As a Result of Violations of the Stark Statute and Anti-Kickback Laws

61.    Plaintiffs repeat and reallege ¶¶ 1 to 60 as if fully set forth herein.

62.     Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by DaVita and the dialysis centers that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by the United States and the State of New Jersey.

63.     By virtue of the false records or statements made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty pursuant to the FCA, as amended by the Federal Civil Penalties Inflation Act, for each violation.

## COUNT III

### New Jersey False Claims Act
### Stat. §2A:32C-3 (a) and (b)

64.     Plaintiffs repeat and reallege ¶¶ 1 to 63 as if fully set forth herein.

65.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

66.     DaVita knowingly provided kickbacks or other illegal remuneration to induce physicians to refer Medicaid patients to DaVita for the provision of medical services.

67.     DaVita knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New Jersey, including those claims for reimbursement for designated health services rendered to patients who were

referred by physicians with whom DaVita had entered into prohibited financial relationships in violation of the Anti-Kickback Statute.

68.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

69.     By virtue of the false or fraudulent claims made and caused to be made by Defendant, the State of New Jersey has suffered damages and therefore is entitled to treble damages under the NJFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT IV

### New Jersey False Claims Act
### Stat. §2A:32C-3 (a) and (b)

70.     Plaintiffs repeat and reallege ¶¶ 1 to 69 as if fully set forth herein.

71.     Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by DaVita and the dialysis centers that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by the State of New Jersey.

72.     By virtue of the false records or statements made and caused to be made by Defendants, the State of New Jersey has suffered damages and therefore is entitled to treble damages under the NJFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States, respectfully prays that judgment be entered in its favor against Defendant as follows:

> 1.    On Counts I and II under the False Claims Act treble the amount of damages sustained by the United States and civil penalties for each false claim or false statement, as provided by law; and

> 2.    On Counts III and IV under the New Jersey False Claims Act, treble the amount of damages sustained by the State of New Jersey and civil penalties for each false claims or false statement as provided by law; and

> 3.    For all Causes of Action alleged herein by Relator, all expenses and attorneys' fees related to this legal action, as provided by law; and

> 4.    Any other equitable relief this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators Philip Varughese and Swatini, LLC hereby demand a trial by jury.

Dated:    White Plains, New York
          September 21, 2018

                                        YANKWITT LLP

                              By: _____
                                  Kathy S. Marks
                                  Russell M. Yankwitt
                                  140 Grand Street, Suite 705
                                  White Plains, New York  10601
                                  (914) 686-1500

                                  *Attorneys for Relators*